EBERLINE *v.* PRAGER.

1. BANKRUPTCY—FRAUDULENT CONCEALMENT OF ASSETS—HUSBAND AND WIFE—BURDEN OF PROOF.

On a bill by a trustee in bankruptcy against a bankrupt and his wife to recover assets from the wife, claimed by the trustee to be held by her in fraud of the bankrupt's creditors, the burden of proof is upon defendants to show, by clear and satisfactory evidence, the means whereby the wife acquired the assets found in her possession.

2. SAME—EVIDENCE—SUFFICIENCY.

Evidence examined, and *held,* insufficient to meet the burden of proof cast upon defendants, requiring a reversal of the decree of the court below in favor of defendants, and one entered here for plaintiff.

Appeal from Wayne; Mandell (Henry A.), J. Submitted January 20, 1920. (Docket No. 23.) Decided February 27, 1920.

Bill by Harry A. Eberline, trustee in bankruptcy, against Benjamin M. Prager and another to recover assets concealed in fraud of creditors. From a decree dismissing the bill, plaintiff appeals. Reversed, and decree entered.

*Fixel & Fixel,* for plaintiff.

*Carey J. Cole,* for defendants.

MOORE, C. J. This suit was brought to recover assets which the trustee in bankruptcy of Benjamin M. Prager claims were concealed in fraud of his creditors. Mr. Prager had been in business in Hamtramck, Michigan, where he failed with $7,870.51 in debts and $3,100.06 in assets. Shortly after his adjudication as a bankrupt a store was opened at 324

Michigan avenue, Detroit, Michigan. Mr. Prager's wife claimed to own the new store. The trustee charges that the use of the wife's name as the proprietor of the new store is a subterfuge and a fraud on Mr. Prager's creditors, and that the assets in the new store are assets fraudulently concealed from them. The trustee for the creditors therefore asks that a receiver be appointed to take charge of the assets in the new store for the benefit of Mr. Prager's creditors. In disposing of the case the trial judge said in part:

"These various matters that are suggested now are matters that go to make the case a very puzzling one and a case that is difficult for possibly a correct decision.

"We have in the case, on the part of the plaintiff a lot of inferences, claims of improbability and certain presumptions that are claimed. As opposed to that, there is testimony under oath, of at least four witnesses. Now to sustain the plaintiff's case, the court would be obliged to find that the presumption, that the improbability of certain things following certain other events, would be much stronger than the direct and positive testimony of four witnesses.

"I don't know that it would be tantamount that the court would be obliged to find that these four witnesses are lying or committing perjury, but its general effect would be that.

"The case is a very puzzling one. In a case of this kind, I would not feel like determining that these witnesses who testified to the capital furnished to start this business and carry it on, are absolutely falsifying."

The chancellor dismissed the bill of complaint.

It may be well at the outset to state the rule of law which should control in cases like this, where the wife of the bankrupt, shortly after the bankruptcy, is in control of considerable property. It is said the burden of proof would be upon her to show, by clear and satisfactory evidence, the means whereby she acquir-

ed the assets found in her possession. 2 Moore on Fraudulent Conveyances, p. 896, reads:

"Sec. 5. Transactions between husband and wife. Purchases of real or personal property, made by the wife of an insolvent debtor during coverture, are justly regarded with suspicion, and in contests with creditors of her husband the general rule is that, if the wife claims ownership of the property by a purchase during coverture, the burden of proof is upon her to show affirmatively and distinctly that the purchase was for a valuable consideration paid by her out of her separate estate, or by some person other than the husband, or that she paid for it with funds not furnished by her husband. Such is the community of interest between husband and wife; such purchases are so often made a cover for a debtor's property; are so frequently resorted to for the purpose of withdrawing his property from the reach of his creditors and reserving it for his own use, and they hold forth such temptations for fraud, that they require close scrutiny. In a contest between the creditors of the husband and the wife there is, and there should be, a presumption against her which she must overcome by affirmative proof."

The same rule is stated in 6 Enc. of Evidence, p. 823:

"1. Presumptions and Burden of Proof.—Property purchased by wife during marriage.—In General.—If a married woman purchases property, the law, as a general rule, presumes that it was paid for with her husband's money, and one who would establish title in her has the burden of proving that the means were not furnished by her husband. As against existing creditors of her husband, ownership by a wife of real or personal property must be established by clear and satisfactory evidence, although the proof need not be so clear as to exclude all doubt, a preponderance of the evidence being sufficient."

*Keeney* v. *Good*, 21 Pa. St. 349, reads in part as follows:

"The plaintiff is the wife of John M. Good who owned certain lands on which a distillery was built.

Becoming insolvent in 1847, Good made an assignment for the benefit of his creditors. The assignee sold the land to one Rheem for $1,100 and by Rheem it was subsequently conveyed to Mrs. Good, the present plaintiff, for the consideration of $1,500. Of this sum $50 were paid at the time the deed was made, and the bonds and mortgage of both husband and wife were afterwards given for the balance. About $1,000 of principal and interest seems to have been paid on the bonds. Immediately after the deed to Mrs. Good, she and her husband made a written agreement that the husband should carry on the business of farming and distilling in her name, accounting to her for the profits, and receiving from her wages at the rate of $20 per month. While he was doing business under this agreement, he bought a lot of hogs, brought them to the distillery, and fed them there for a time. The defendants levied on them as the husband's property, and the wife brought this action of trespass.

"Upon these facts the defendants asked the court for peremptory charge in their favor. This the court refused, but on the contrary submitted the case to the jury, with instructions to find for the plaintiff if the agreement was an honest one, made for the purpose of enabling an insolvent man to support his family, and if the first $50 was paid with the wife's money, and the balance out of the profits of the business.

"An insolvent man is well protected in Pennsylvania. The barbarous system of imprisonment for debt is totally abolished and thrown aside among the rubbish of the dark ages. He can retain real property or goods to the value of $300 which his creditors may not touch. He cannot be prevented from applying the fruits of his personal industry to the maintenance and education of his family; for the wages of his labor are not liable to attachment. But after supporting his family, he must give the best exertion of his mind and body to his creditors. This is but his reasonable duty—a duty sanctioned by all laws, moral, civil and divine. No effectual mode of evading it has yet been invented. The usual device of covering the property of the debtor under the name of some friend, or a member of his family, will only answer the purpose as long as it remains undiscovered. I need not

say how deeply all such shams are branded by the law with the detestation.

"Creditors may regard the mere possession and use of personal property by a debtor as evidence that no stranger has a right to it, unless it has once already been taken for his debts, and bought in for him at a judicial sale, or unless he has it as a borrower or other bailee. But by the act of 11th April, 1848, a married woman may have property in her own right which shall not be subject to levy for her husband's debts. Of such property possession is no test of title. The rule in Twyne's Case cannot, in the nature of things, be applied to a wife's goods in favor of her husband's creditors, without either compelling a separation or rendering the law inoperative. He may ride in her carriage, eat at her table, sleep in her bed and live in a house filled with her furniture, without making what he uses liable to be seized under an execution issued against him. * * *

"But there is nothing in the act of 1848 which makes such consequences at all necessary. To bring the property of a married woman under its protection, it is made necessary by the letter, as well as the spirit of the statute, to prove that she owns it. She must identify it as property which was hers before marriage, or show how she came by it afterward. Evidence that she purchased it amounts to nothing unless it be accompanied by clear and full proof that she paid for it with her own separate funds. * * *

"We are unanimously and clearly of opinion that the defendants had a right to the instructions they prayed for. They were as well entitled to a verdict as if the plaintiff had given no evidence at all."

In *Wimberly* v. *Fertilizer Co.*, 132 Ala. 107 (31 South. 524), it was said:

"When assailed by them (the husband's creditors) the burden is on the wife of proving that the consideration did not move from the husband but was paid by her separate money. *Kelley* v. *Connell, Green & Co.*, 110 Ala. 543 (18 South. 9). 'To the lifting of such burden, affirmative averment of the facts relied on as constituting the consideration is as essential as

convincing proof of their existence.' The laboring oar in such case is upon defendant, not simply to deny that there was no consideration, as averred in the bill, but to state the affirmative fact, that there was such consideration, in what it consisted and how it was paid, and to support these averments by evidence.

"Furthermore, 'In a contest between creditors and the wife, there is, and there should be a presumption against her which she must overcome by affirmative proof.' *Seitz* v. *Mitchell*, 94 U. S. 580; *Kelley* v. *Connell, Green & Co., supra; Wood* v. *Riley*, 121 Ala. 100 (25 South. 723)."

The defendants do not seriously dispute the law of the case but say they have fully met the burden put upon them, satisfying the chancellor in the court below, and that upon this record we ought not to disturb his decree. The case was tried in open court and we are not unmindful of the fact that the opportunity to see the witnesses gives the trial judge a great advantage over the Justices of this court in deciding questions of fact. *Hammond* v. *Rathbone*, 113 Mich. 499. The trial judge, however, seemed to be in great doubt as to what decree he ought to find.

There are some facts that are not in dispute. Mr. Prager, in April, 1917, opened a store in Hamtramck. Mrs. Prager assisted him in the store. In June, 1918, he filed a voluntary petition in bankruptcy showing assets of $3,100.06 and liabilities of $7,870.51. As early as in the following August a store was opened on Michigan avenue, Detroit, his wife claiming to be the proprietor. He acted as the buyer of the goods that went into the store and assisted her in and about the store. It is her claim that with the exception of the goods which were exempt to Mr. Prager, valued at $250, none of his goods ever went into the store. It is her claim that a sister living in Cleveland gave her $200 with which she bought some of the fixtures formerly owned by Mr. Prager, at the bankrupt sale, and she further claims that one day she met on the streets

of Detroit Mrs. Biederman, who was a girlhood friend
of hers in Vienna, Austria, whom she had not seen
for 22 years, and that she confided her troubles to
Mrs. Biederman, who finally loaned her $2,000 which
she handed over to her husband to buy goods for her,
and that he was a very skillful buyer, who bought
job lots of goods which were put into the store and
sold at a profit of from 100 to 150 per cent., with the
result that within six or eight weeks after she bor-
rowed the money in August she had paid the $2,000
loan in full, and in the following January paid $570
in cash for an automobile, and had a stock of goods
on hand. In the meantime her family of five chil-
dren she claims was supported out of the proceeds
of the business. Mr. and Mrs. Biederman were wit-
nesses who gave testimony tending to support Mrs.
Prager's claims.

We quote some of Mr. Biederman's testimony:

"My name is Morris Biederman. I am 40 years old
and am a jeweler. Have lived in Detroit 12 years.
I just met Mrs. Prager, you know, when she called for
the money. My wife came down town, down to the
store and she told me she met her friend she had not
seen for many years, and that she was asking her for
some money. I asked how much it would be. She
said $2,000. I said, 'My God, I can't spare $2,000.'
She said that she had got the money. I told her, you
know, if she has got the money let her give it. I was
surprised when she handed the money. I was there
when the money was turned over to Mrs. Prager.
They signed a paper. I made it out; Mrs. Prager
signed it. Every time that the payment was made, it
was endorsed on the back of the note. The note was
finally paid in full.

"Q. About how long did Mrs. Prager take in pay-
ing you?

"A. I think the last payment was by the end of
September. I made it out 60 days. It was paid be-
fore or at the time it was due."

On the cross-examination he testified in part:

"I never knew this woman. She did not tell me her husband was bankrupt. I did not know he was bankrupt from what my wife told me. I knew it after I loaned the money. I knew my wife had some money. I didn't know that she got $2,000. I didn't figure it amounted to anything. I didn't know what she has got today. I didn't know that she had this $2,000. I kept my money in the savings and checking account.

"Q. And had a safe in the store?

"A. Yes.

"Q. Where did you keep your jewelry, all of your valuable watches and things that you put away every night—in the safe?

"A. Yes.

"Q. And your wife helped you occasionally in the store?

"A. Yes.

"Q. Knew you had the safe, knew the combination?

"A. Sure, sure.   *    *    *

"Q. But the money stayed upstairs somewhere in the house?

"A. Yes; I didn't know how much money she had. I was present when the money was counted out to Mrs. Prager. It was different money, big and small. When she paid me—give me the payment—I would mark it on the back of the note and the date. The amount and the day. I don't remember how many of these endorsements there were.

"Q. How much was the first one?

"A. I couldn't tell you.

"Q. What was the date of the first one?

"A. I don't remember.

"Q. Have you got a record at the store?

"A. No, sir.

"Q. When they paid you the payment, what did you do with the money?

"A. Kept it.

"Q. Kept it in the safe or put it back upstairs where it was in hiding?

"A. I kept it in the safe."

Mrs. Prager and Mrs. Biederman told substantially the same story as did Mr. Biederman, but with

many inconsistencies. The Pragers made written statements to the commercial agencies that cannot be harmonized with their present claim. They seemed unable to tell where job lots of goods were bought in any considerable quantities, while evidence was introduced on the part of the plaintiff that during the last half of the year 1918, and the early part of 1919, it was difficult to find job lots for sale, and especially difficult to buy them upon terms that would allow any considerable profit.

We are asked to believe that Mrs. Biederman had saved without the knowledge of her husband upwards of $2,000 which she kept upstairs in a stocking or in her bed mattress, and that she loaned it with the approval of her husband to her girlhood friend without any security, and with only a note given back, and that this note was paid in full with the profits of the business which it established within 60 days of its date, and when paid the note was torn up, making it impossible to produce it at the trial. If the defendants' evidence is believed Mr. Prager in 17 months' business in Hamtramck so managed as to lose more than $5,000, while in half that time, while acting for his wife, who in addition to looking after the business, also looked after the household of five children, developed a business of the same kind on Michigan avenue, so that it showed a profit of much more than $5,000. We have examined with care the documents offered in evidence and have weighed carefully the oral evidence and think the defendants have not met the burden of proof which the law puts upon them.

The decree is reversed and one may be entered here in accordance with the prayer of the bill of complaint, with costs to the plaintiff.

STEERE, BROOKE, FELLOWS, STONE, CLARK, BIRD, and SHARPE, JJ., concurred.